# CONTINUATION OF APPLICATION FOR SEARCH WARRANT

## INTRODUCTION AND AGENT BACKGROUND

1.  I, Brent Johnson, submit this continuation in support of an application for a warrant to search information that is stored at premises controlled by Google, a provider of electronic communications service and remote computing service headquartered in Mountain View, California. The information to be searched is described in the following paragraphs and in Attachment A. This search warrant application seeks issuance of a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) that requires Google to disclose to the government the information further described in Attachment B.I. The government will then review that information and seize the information that is further described in Attachment B.II.

2.  I am a Special Agent (SA) of the FBI, and have been so employed since December 2002. I am currently assigned to the Kalamazoo office of the FBI's Detroit Division. I am trained and experienced in the investigation of violations of Federal criminal law, including the preparation, presentation, and service of criminal complaints and arrest and search warrants. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.  The matters set forth in this continuation are either known personally to me or were related to me by other persons acting in their official capacities as officers and agents of the United States, the State of Michigan, and local jurisdictions within Michigan. Because it is submitted for the limited purpose of establishing probable cause to search for evidence, this affidavit does not necessarily recite all of the facts of the underlying investigation that are known to me or to other investigators at this time. I submit that the matters set forth in this continuation demonstrate probable cause to believe that property (defined in Fed. R. Crim. P. 41(a)(2)(A) as

including information) as described in Attachment "B" to the Search Warrant Application will be found at the place to be searched, and that those items constitute evidence of the following offenses: 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) [distribution of controlled substance causing death].

**JURISDICTION**

4. I am advised by the U.S. Attorney's Office that this Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). I am also advised that, pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Finally, I am advised by the U.S. Attorney's Office that the notice requirement of Fed. R. Crim. P. 41(f)(1)(C) applies to the service provider, not to the subscriber or customer of the service, pursuant to 18 U.S.C. § 2703(b)(A). See United States v. Bansal, 663 F.3d 634, 662-63 (3d Cir. 2011).

**BACKGROUND RELATING TO GOOGLE AND RELEVANT TECHNOLOGY**

5. Based on my training and experience, I know that cellular devices, such as mobile telephone(s), are wireless devices that enable their users to send and receive wire and/or electronic communications using the networks provided by cellular service providers. In order to send or receive communications, cellular devices connect to radio antennas that are part of the cellular network called "cell sites," which can be mounted on towers, buildings, or other infrastructure. Cell sites provide service to specific geographic areas, although the service area of a given cell site will depend on factors including the distance between towers. As a result,

information about what cell site a cellular device connected to at a specific time can provide the basis for an inference about the general geographic location of the device at that point.

6. Based on my training and experience, I also know that many cellular devices such as mobile telephones have the capability to connect to wireless Internet ("wi-fi") access points if a user enables wi-fi connectivity. Wi-fi access points, such as those created through the use of a router and offered in places such as homes, hotels, airports, and coffee shops, are identified by a service set identifier ("SSID") that functions as the name of the wi-fi network. In general, devices with wi-fi capability routinely scan their environment to determine what wi-fi access points are within range and will display the names of networks within range under the device's wi-fi settings.

7. Based on my training and experience, I also know that many cellular devices feature Bluetooth functionality. Bluetooth allows for short-range wireless connections between devices, such as between a mobile device and Bluetooth-enabled headphones. Bluetooth uses radio waves to allow the devices to exchange information. When Bluetooth is enabled, a mobile device routinely scans its environment to identify Bluetooth devices, which emit beacons that can be detected by mobile devices within the Bluetooth device's transmission range, to which it might connect.

8. Based on my training and experience, I also know that many cellular devices, such as mobile telephones, include global positioning system ("GPS") technology. Using this technology, the phone can determine its precise geographical coordinates. If permitted by the user, this information is often used by apps installed on a device as part of the app's operation.

9. Based on my training and experience, I know Google is a company that, among other things, offers an operating system ("OS") for mobile devices, including cellular phones,

3

known as Android. Nearly every cellular phone using the Android operating system has an associated Google account, and users are prompted to add a Google account when they first turn on a new Android device.

10. In addition, based on my training and experience, I know that Google offers numerous online-based services, including email (Gmail), navigation (Google Maps), search engine (Google), online file storage (including Google Drive, Google Photos, and Youtube), messaging (Google Hangouts and Google Allo), and video calling (Google Duo). Some services, such as Gmail, online file storage, and messaging, require the user to sign in to the service using their Google account. An individual can obtain a Google account by registering with Google, and the account identifier typically is in the form of a Gmail address. Other services, such as Google Maps and Youtube, can be used while signed in to a Google account, although some aspects of these services can be used even without being signed in to a Google account.

11. In addition, based on my training and experience, I know Google offers an Internet browser known as Chrome that can be used on both computers and mobile devices. A user has the ability to sign in to a Google account while using Chrome, which allows the user's bookmarks, browsing history, and other settings to be synched across the various devices on which they may use the Chrome browsing software, although Chrome can also be used without signing into a Google account. Chrome is not limited to mobile devices running the Android operating system and can also be installed and used on Apple devices.

12. Based on my training and experience, I know that, in the context of mobile devices, Google's cloud-based services can be accessed either via the device's Internet browser or via apps offered by Google that have been downloaded onto the device. Google apps exist

for, and can be downloaded to, phones that do not run the Android operating system, such as Apple devices.

13. Based on my training and experience, I know that Google collects and retains location data from devices running the Android operating system when the user has enabled Google location services. Google then uses this information for various purposes, including to tailor search results based on the user's location, to determine the user's location when Google Maps is used, and to provide location-based advertising. In addition, I know that Google collects and retains data from non-Android devices that run Google apps if the user has enabled location sharing with Google. Google typically associates the collected location information with the Google account associated with the Android device and/or that is signed in via the relevant Google app. The location information collected by Google is derived from sources including GPS data, information about the cell sites within range of the mobile device, and information about wi-fi access points and Bluetooth beacons within range of the mobile device.

14. Based on my training and experience, I also known that Google collects and retains information about the user's location if the user has enabled Google to track web and app activity. According to Google, when this setting is enabled, Google saves information including the user's location and Internet Protocol address at the time they engage in certain Internet- and app- based activity and associates this information with the Google account associated with the Android device and/or that is signed in with the relevant Google app.

15. Location data, such as the location data in the possession of Google, can assist in a criminal investigation in various ways. As relevant here, I know based on my training and experience that Google has the ability to determine, based on location data collected via the use of Google products as described above, mobile devices that were in a particular geographic area

5

during a particular time frame and to determine which Google account(s) those devices are associated with.  Among other things, this information can inculpate or exculpate a Google account holder by showing that he was, or was not, near a given location at a time relevant to the criminal investigation.

16. Based on my training and experience, I know that when individuals register with Google for an account, Google asks subscribers to provide certain personal identifying information.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

17. Based on my training and experience, I also know that Google typically retains and can provide certain transactional information about the creation and use of each account on its system. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, Google often has records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an

IP address, IP address information can help to identify which computers or other devices were used to access the account.

## PROBABLE CAUSE

18.     I submit that the facts summarized in this continuation demonstrate that there is probable cause to believe that Damiane BUEHRER is responsible for the 11 Jan. 2017 death of Michigan resident Tyler Herendeen in Hillsdale County, Michigan, a death that resulted from Herendeen's ingestion of carfentanil that he obtained from BUEHRER, and that the information described in Attachment B will constitute evidence of this.

19.     At 8:42 p.m. on 11 January 2017, a 911 caller reported a car on fire at an isolated location on Voorheis Rd. in Somerset Township, which is located in Hillsdale County in the Western District of Michigan. The caller made a recording of the fire after she called 911, and it shows the vehicle fully engulfed in flame at that time. First responders extinguished the fire at approximately 8:57 p.m., and at about 9:30 p.m. officers from the Michigan State Police (MSP) Jackson Post responded to the scene. They found that a small SUV had been consumed by fire, and also discovered a human body in the rear storage area of the vehicle that was burned beyond recognition. Officers from the MSP Fire Investigation Unit were also on scene, and later concluded that the cause of the fire was arson.

20.     A Michigan license plate, CGC4709, was found lying on the road surface behind the vehicle, and a query of records maintained by the State of Michigan disclosed that the vehicle was a blue 2005 Ford Escape registered to a couple residing in nearby Jonesville, MI. When later questioned by MSP investigators, the couple stated that they had sold the vehicle to their nephew, Tyler Herendeen, about a month before.

21. When investigators interviewed Herendeen's mother, she confirmed that her son had bought the vehicle from his aunt and uncle. She also stated that she had not seen her son since before 10 January, and that he had not responded yet to a text message she sent him on 10 January.

22. An autopsy performed by the Lucas County Coroner's Office later determined, from dental records, that the burned body recovered from the vehicle was that of Tyler Herendeen. Subsequent toxicology tests performed on the remains also discovered the presence of carfentanil. Based on my training and experience, I know that carfentanil is a synthetic opioid that heroin dealers often add to their product. On 28 Feb. 2017, MSP investigators interviewed CH, a known friend of Herendeen's, and he stated that Herendeen told him in December 2016 that he had been buying heroin from Damiane BUEHRER. On the date of the fire, BUEHRER lived at a residence about four miles from the burn site.

23. According to records of the State of Michigan, BUEHRER served over six years in prison, from 2010 to 2016, for felony delivery/manufacture of controlled substance, and was on parole in Hillsdale County at the time of the fire. Herendeen, in turn, had been arrested and charged in December 2016 for possessing controlled substances.

24. On 21 June 2017, the Hillsdale County Central Dispatch received a 911 call from a female who stated that a friend of hers, JE, was confined at the Hillsdale County Jail and wanted to speak with MSP investigators about the arson and the body that had been recovered from the vehicle. That same day, MSP investigators interviewed JE at the jail. JE confirmed that he had asked his girlfriend to contact MSP for him, and stated that he had firsthand knowledge about the circumstances of Herendeen's death.

25. In the course of the initial interview on 21 June and a follow-up interview on 30 June, JE related that he had been staying at BUEHRER's residence since shortly before Christmas 2016, that BUEHRER was a friend of his, and that he was staying at BUEHRER's because there were outstanding arrest warrants for him at the time and BUEHRER had offered him a place to hide. JE stated that BUEHRER was a heroin dealer, and that he had seen Herendeen at BUEHRER's residence before. According to JE, Herendeen called BUEHRER on the day he died and said he wanted to come over, and then arrived early in the afternoon. Herendeen then warned BUEHRER to stay away from a heroin user named "Lane" because Herendeen had told law enforcement about Lane and did not want BUEHRER to get caught selling heroin to him. JE stated that BUEHRER took Herendeen out to his garage, and then returned alone after a time stating that he had given Herendeen a dose of heroin and that Herendeen had passed out. JE stated that BUEHRER was not concerned about this because BUEHRER's wife, KB, was also a regular heroin user and routinely passed out after taking the drug.

26. JE stated that BUEHRER then asked him to go out to the garage and to keep an eye on Herendeen because he had to go to Jackson to get KB out of jail. JE reluctantly agreed, and saw BUEHRER pull Herendeen's blue SUV into the garage before he left. JE also saw BUEHRER take Herendeen's cellphone and erase a number from the call log, which he assumed was Herendeen's pre-visit call to BUEHRER. After erasing the call log, BUEHRER tossed the phone on the front seat of Herendeen's car and left.

27. JE stated that he watched Herendeen, who was sleeping on a mattress in the garage, for several hours until BUEHRER returned with KB. Herendeen was fully clothed and wearing a winter coat and stocking cap, but JE put several blankets over him because it was very

9

cold, and JE saw that he was breathing and snoring. While JE was watching Herendeen, he noticed that the phone in the car kept receiving calls. JE looked at the phone's screen several times, and saw the word "Dad" displayed as the phone rang. Subsequent investigation determined that Herendeen's father had tried repeatedly on 11 January 2017 to contact his son, without success.

28. JE went back into the house after BUERHER and KB returned, leaving the two in the garage with Herendeen. JE fell asleep for some period of time, but did notice that KB came into the house and fell asleep while BUEHRER made several trips between the house and the garage. At some point, BUEHRER came back into the house in a panic and stated that he thought Herendeen was dead, adding that he was "not going to go down for that snitch." BUEHRER then asked JE for help disposing of Herendeen's body, but JE refused to become involved. BUEHRER then told KB that she had to help him dispose of the body, and she agreed. BUEHRER then retrieved a gas can, stating that he was going to burn Herendeen's car. BUEHRER and KB then went out to the garage and JE saw them leave in two cars, with KB driving BUEHER's car and BUEHRER driving Herendeen's car.

29. BUEHRER and KB returned to the house sometime later on 11 January, and BUEHRER stated that it was "all taken care of." The next morning, JE went out to the garage and saw that the area where Herendeen had been lying appeared to have been cleaned with some sort of liquid, and that the mattress Herendeen had lain on had been burned down to its springs behind the garage and the residue had been covered with straw. That same day, JE heard on the news that a human body had been found in a burned-out car elsewhere in Hillsdale County.

30. JE stated that BUEHRER had been dealing the drugs the whole time he stayed with him, and would typically meet his customers at remote roadside spots in the country.

Customers who were well known to BUEHRER, like Herendeen, would sometimes meet at BUEHRER's house to receive his drugs.  JE stayed at BUEHRER's residence until his own arrest in March 2017.

31.     In addition to JE, on 21 June 2017 MSP investigators also interviewed a Jonesville resident named AL.  AL admitted that, like Herandeen, he was a heroin addict, and stated that BUEHRER was their dealer.  AL stated that JE was staying with BUEHRER at the time of Herendeen's death, because JE was a fugitive from justice and BUEHRER was his friend.  AL also stated that he was familiar with the remote location where Herendeen's body and vehicle were discovered because he had met BUEHRER there in the past to obtain heroin.

32.     The property where BUEHRER resided on 11 Jan. 2017 is located at the following latitude/longitude coordinates: 41°59'7.77"N by 84°28'15.21"W.  The geographic area on Voorheis Rd. where Tyler Herendeen's burned body was found is bordered by the following coordinates:   **A:** 41°99'42.80"N by 84°42'05.60"W;  **B:** 41°99'42.80"N by 84°41'20.00"W; **C:** 41°98'58.00"N by 84°41'20.00"W; and **D:** 41°98'58.00"N by 84°42'05.60"W.  The noted coordinates define the "Target Locations."

33.     Based on the foregoing, I submit that there is probable cause to search information in the possession of Google relating to what devices were in the Target Locations described in Attachment A during the time period described in Attachment A, as well as information that identifies the Google accounts with which those devices are associated, for evidence of the crime(s) at issue in this case.  Among other things, this information can inculpate or exculpate a Google account holder by showing that he was, or was not, near a given location at a time relevant to the criminal investigation.

34.     In order to facilitate the manageable disclosure of and search of this information, the proposed warrant contemplates that Google will disclose the information to the government in stages rather than disclose all of the information for which the government has established probable cause to search at once.  Specifically, as described in Attachment B.I:

   a. Google will be required to disclose to the government an anonymized list of devices that specifies information including the corresponding unique device ID, timestamp, coordinates, and data source, if available, of the devices that reported their location within the Target Location described in Attachment A during the time period described in Attachment A.

   b. The government will then review this list in order to prioritize the devices about which it wishes to obtain associated information.

   c. Google will then be required to disclose to the government the information identifying the Google account(s) for those devices about which the government further inquires.

## **CONCLUSION**

35.     Based on the forgoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c).

36.     I further request that the Court direct Google to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on Google, which will then compile the requested records at a time convenient to it, and because the property disclosed pursuant to the warrant will be examined by investigators of the FBI and the Michigan State Police on FBI and MSP

premises, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.